UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A SILVER LG CELL PHONE CURRENTLY LOCATED IN SECURE EVIDENCE STORAGE AT FBI OFFICE, 55 PLEASANT ST., CONCORD, NH | Docket no. 1:21-mj-186-01-AJ<br><br>**FILED UNDER SEAL, LEVEL II** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Task Force Officer ("TFO") Matthew B. Harnish, being first duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—a silver LG cell phone, seized from Dylan Greene on November 28, 2020 (the "Device"), which is currently in law enforcement's possession—and the extraction from that property of electronically stored information described in Attachment B related to violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances). The device is currently located in secure evidence storage at the Federal Bureau of Investigation ("FBI") office located at 55 Pleasant Street in Concord, New Hampshire.

2. I am a police officer with the Dover, NH Police Department, and I have been a full-time certified police officer in the State of New Hampshire for approximately 8 years. I attended and graduated from the 161st New Hampshire Police Academy where I obtained my

certification as a full-time police officer. I joined the Dover Police Department in 2013. From 2013 to 2019, I was assigned to the Dover Police uniformed patrol division. Some of my duties while assigned to the patrol division included basic patrol duties, investigations ranging from minor violations to misdemeanors and felonies, report writing, interviewing witnesses and suspects, and evidence collection and processing. I also completed search and arrest warrants that involved violations of the Controlled Drug Act.

3. I am currently assigned to the Dover Police Department's Special Investigations Unit as a detective and have been assigned in this role since April of 2019. More specifically, in my role as a detective I was assigned to the New Hampshire Safe Streets Gang Task Force, FBI - Boston Division. Over the course of my employment as a Dover Police Officer/Detective and FBI Task Force Officer, I have participated in hundreds of criminal investigations which have resulted in arrests for crimes involving controlled substance violations, firearms violations, home invasions, larceny, assault and battery with a dangerous weapon, breaking and entering, and armed robbery. My primary duties as a Detective and FBI TFO are to investigate the distribution of controlled substances in violation of state and federal drug laws, including Title 21, United States Code, Section 841. Many of the investigations that I have been involved with relate to offenses involving the possession, sale, and possession with intent to sell various controlled drugs.

4. I have personally been involved in various drug investigations. I have participated in all aspects of drug investigations including surveillance, executing searches pursuant to court-ordered search warrants, and executing arrests. I have received extensive specialized training in the field of controlled substance identification, investigation, and enforcement. I have also personally observed the distribution, sale, and possession, of various controlled substances

including, but not limited to, cannabis, cocaine, cocaine base ("crack" cocaine), heroin, fentanyl, oxycodone, methamphetamine, and marijuana.

5.     I have received significant training in the field of narcotics enforcement and investigations. During my career in law enforcement, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug trafficking conspiracies.  In the course of conducting criminal investigations, I have employed the following techniques: interviewing informants and cooperating witnesses, conducting physical surveillance, conducting short-term and long-term narcotics investigations, consensual monitoring and recording of both telephonic and non-telephonic communications, conducting controlled drug purchases, and preparing and executing search warrants that resulted in seizures of narcotics, firearms, and other contraband.

6.     I have written and/or participated in the execution of numerous search warrants resulting in the seizure of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances, United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing, and distribution of controlled substances, as well as collection, expenditure, accounting, transportation, and laundering of drug proceeds.  I have participated in debriefing numerous defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations.

7.     I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other FBI Agents and Task Force Officers and local police departments. Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search

warrant, I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

## **PROBABLE CAUSE**

8. On September 15, 2020, I received information from a confidential source ("CS") about drug activity occurring in the City of Dover, NH. The CS was referred to me by Sergeant Plummer of the Dover Police.

9. █████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████

10. The CS began cooperating with law enforcement—████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
████████████.

11. ████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████

12. The FBI has paid the CS $700 to date to provide information in connection with this investigation.

13. The CS told me that Dylan Greene ("Greene") would be traveling from the Best

Western Hotel in Hampton, NH to Dover.  The CS sent me a picture of packaged drugs that the CS observed in Greene's possession days prior in a hotel room at the Best Western Hotel.  The CS said Greene has been involved in drug sales and would be in possession of a sizeable quantity of heroin/fentanyl during his travels.  Further, the CS said that Greene would be in a dark colored pickup truck with an OHRV in the bed of the vehicle.

14. I am familiar with Greene through multiple prior police contacts.

15. On September 16, 2020, I went to the Best Western Hotel and located a dark green Ford F-150 with a blue Yamaha OHRV in the bed, which matched the description provided by the CS.

16. Around 9:30 am, I observed Greene and another male load items into the truck and leave shortly thereafter.  I followed the truck as it travelled north and eventually into the City of Dover.

17. While following the vehicle in Dover, I relayed my observations to Sergeant Christopher Plummer, who was in full uniform and operating a marked City of Dover Police vehicle.  Sergeant Plummer has previous narcotics investigation experience and was formerly an investigator with the NH Attorney General's Drug Task Force.

18. Sergeant Plummer located the target vehicle traveling on Piscataqua Road and observed that the rear plate was handwritten on cardboard with the number         .  Sergeant Plummer attempted to query the registration with the DMV and could not locate a valid registration.  As a result, Sergeant Plummer stopped the truck on Spruce Drive in Dover.

19. The operator was identified as Eric Varney ("Varney') of Middleton, NH.  Sergeant Plummer attempted to interview Varney, but he would not answer any questions.  Sergeant Plummer observed that Varney was breathing heavily, avoiding eye contact, and his

hands were shaking.

20. The passenger in the vehicle was confirmed to be Dylan Greene and he explained they were driving to Rochester, NH to install a car radio in his girlfriend's vehicle. While speaking with Greene, Sergeant Plummer observed a large steak knife near his left hand, and a large wooden baton-like weapon on the passenger floorboard.

21. Upon request, Greene exited the truck. He allowed Sergeant Plummer to perform a "pat frisk" and when confronted about drugs being in the vehicle, he admitted that he had a pill vial that contained heroin in the truck.

22. Sergeant Plummer asked Varney for consent to search the vehicle and he refused.

23. The vehicle was towed from the scene and secured at Dover Police Department.

24. An inquiry revealed that the vehicle was registered in the name of Brittany Salucco ("Salucco"). The FBI conducted an interview of Salucco on September 17, 2020. Salucco stated that, a few weeks prior, she had accompanied Greene to a car dealer where he bought the vehicle with approximately $21,000 cash from his pocket, but he asked her to sign the title because he had state drug charges preventing him from purchasing it.

25. A search was subsequently conducted of the vehicle pursuant to a warrant returned on September 16, 2020. The Dover Police Department executed the search on September 16, 2020. They seized approximately 350 grams of powdered substance in various forms of packaging, along with other evidence of drug distribution, including but not limited to a digital scale, over $2,000 in cash, and notebooks (one with Dylan Greene's name on it) containing names and numbers appearing to be drug ledgers. The majority of the drugs were located inside a black zippered case in the center console of the vehicle. The tan powder was later transferred to the state laboratory where tests confirmed it is fentanyl.

26. In an interview on September 17, 2020, Varney—the operator of the Ford F-150 that was searched—told me and FBI Special Agent Paul Mullen that Varney drove the F-150 from the Best Western to Dover at Greene's request because Greene did not have a license. Varney helped Greene pack his bags into the car at the Best Western. They then made a stop at a convenience store and a Walmart before getting pulled over in Dover.

27. Varney admitted that he had a heroin/fentanyl habit and that Greene sold him heroin/fentanyl in $60 quantities at a time. He estimated that he had bought heroin/fentanyl from Greene approximately ten times in the last year.

28. Varney stated that he mostly talks and texts with Greene by phone.

29. The CS who had given the original information about Greene that led to the traffic stop of the vehicle after it left the Best Western hotel said he/she was contacted by Greene after the seizure of his vehicle, and Greene informed him/her that there was a "half key" of drugs in the car, and he was trying to skip town before police obtained the search warrant.

30. Greene is currently detained pending trial of the charges in this matter.

31. Through my training and experience in drug trafficking investigations, I have become familiar with the manner in which drug traffickers communicate by wire, often by telephone and Short Message Service (commonly referred to as text messaging). I know that individuals who distribute narcotics often utilize cellular telephones, and the text messaging capability included within their cellular telephones, as a method by which to arrange narcotics transactions.

32. Drug traffickers often carry smartphones in order to use applications including instant messaging applications (or "Apps") called "WhatsApp" which also uses the Internet to send text messages. This App also gained popularity with drug traffickers because it was

historically difficult for law enforcement to intercept messages sent through the App. Drug traffickers use other apps like the GPS applications, that may include evidence of their drug-related travels. Phones and apps can also store photos and financial information.

33.     I know that cellular phones can contain substantial evidence about a drug trafficker's activities. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from many cell phones. In addition to communications (in Apps like WhatsApp, over text messages, or through call history), they may also contain photographs and videos of drugs, drug activities, or drug associates, location data that could shed light on where traffickers meet customers or suppliers or locations of stash houses, contact lists, ledgers, and other evidence. Finally, cellular phones may contain records of financial transactions and/or accounts where drug proceeds are stored. I know, based on my training and experience, that people who deal in drugs like fentanyl often have large amounts of cash and may need to launder that money in order to facilitate their business or hide the illicit nature of their incomes. Evidence of how they do this may be on cellular telephones. All of this information may be stored on the phone and in applications on the phone.

34.     The Device is currently in the lawful possession of law enforcement. It came into the department's possession when seized on November 28, 2020.  On that day, Greene was arrested in Dover on an outstanding warrant, including charges for non-appearance in Strafford County on a separate drug offense, and two bench warrants for non-appearance in court related to theft and fraud charges.  He was then transported, on the same day, to Somersworth on outstanding warrants involving resisting arrest, reckless conduct with a deadly weapon, and other

charges. His cell phone—the Device—was seized by the Somersworth Police Department, and it was placed in secure evidence storage there. On or about December 10, 2021, it was transferred to the custody of the FBI. The phone was held in temporary storage until February 26, 2021, at which time I delivered it to, and stored it in, secure evidence storage at the FBI office at 55 Pleasant St. in Concord, NH. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Somersworth Police Department.

## **TECHNICAL TERMS**

35.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing

and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some

GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

    f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

36. Based on my training, experience, and research, I know that the Device has capabilities that allows it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

37. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can

sometimes be recovered with forensics tools.

38.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   b. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   c. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual

information necessary to understand other evidence also falls within the scope of the warrant.

  d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

39. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant. Alternatively, investigators may review the copy of the device already made by investigators who searched it pursuant to the state warrant as discussed herein.

40. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**CONCLUSION**

41.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

/s/ Matthew Harnish
MATTHEW HARNISH
TASK FORCE OFFICER
FEDERAL BUREAU OF INVESTIGATION

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: July 20, 2021
Time: 12:04 PM, July 20, 2021

HONORABLE ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The property to be searched includes a silver LG cellular phone seized from Dylan Greene on November 28, 2020 ("the Device"). The Device is currently located in the secure evidence storage at the FBI office at 55 Pleasant St. in Concord, New Hampshire.

This warrant authorizes the forensic examination of the Device by the FBI, Dover Police Department, or other law enforcement agencies assisting in the investigation, for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1. All records on the Device described in Attachment A that relate to violations of drug trafficking, 21 U.S.C. §§ 841(a)(1), including:

    a. Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

    b. lists of customers and related identifying information;

    c. types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

    d. any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

    e. any information involving the travel to obtain controlled substances or the transportation of controlled substances;

    f. information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

    g. all bank records, checks, credit card bills, account information, and other financial records;

    h. Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.